**TRANSPORT POOL DIVISION OF CONTAINER LEASING, INC., a California corporation,**

v.

**JOE JONES TRUCKING CO., Inc., Joe Jones, d/b/a Joe Jones Trucking Company, and Jesse B. Blayton.**

**Civ. A. Nos. 12099, 12590.**

United States District Court,
N. D. Georgia,
Atlanta Division.

Nov. 24, 1970.

---

4. Preamble to the United States Constitution.

W. M. Mathews, Jr., Atlanta, Ga., for Jesse B. Blayton.

William H. Traylor, Emory Neighborhood Law Service, Atlanta, Ga., for Joe Jones.

## ORDER

EDENFIELD, District Judge.

With this order, barring reversal or egregious oversight, this case will end. It has been quite an experience for the court, often confused, at some points hilarious, and in many ways sad.

Joe Jones is a black man of ample girth, ebullient good humor, and adequate native intelligence, given at all times to boundless and sometimes torrential conversation. During World War II he earned an impressive record and numerous medals for himself as driver of the "Red Ball Express" the military truckline which supplied Allied armies in many parts of Europe.

Returning home after the war he attracted nationwide attention in his efforts to obtain an ICC certificate for a truckline he wished to start. With the help of nationally known figures, including senators and others, and further aided by a $25,000 SBA loan, the certificate was finally granted and the business started. Here, alas, Joe's troubles began; for to say, despite his truck-driving talents, that Jones was inept at business, is the understatement of this or any other century.

The ICC certificates were originally issued to Jones individually but in order to obtain additional financing he agreed to (and later did) transfer them to a corporation bearing his name but in which Defendant Blayton was President and principal stockholder.

Joe confined himself strictly to operations. Blayton had other business interests. Such records as were kept were hopelessly inadequate so that it is doubtful if at any time the owners knew whether the business was making or losing money, and if so, on which transaction.

Lipshutz, Macey, Zusmann & Sikes, Atlanta, Ga., for plaintiff.

At about this time the business started leasing equipment from Plaintiff Transport Pool, and to induce them to extend credit Defendant Blayton on May 9, 1967, wrote a letter to Plaintiff Transport Pool, with a copy to "Mr. Joe Jones, Jr., Joe Jones Trucking Company, Inc.", reciting that Mr. Joe Jones, Jr. "of the subject firm" had made application for credit and stating "I am guaranteeing the credit extended to him under this arrangement."

Pursuant to this undertaking credit was extended to the corporation, not to Joe Jones individually. When the account got in arrears Defendant Blayton made numerous promises to pay for the corporation, stating that he was part of the corporation. Such payments as were made on the account were by corporate check signed by Blayton. The corporate minutes reveal that Blayton had specifically said that he was standing behind the corporation's debts and on January 4, 1968 Blayton individually executed a note to plaintiff for $11,256.05, representing the outstanding indebtedness of the corporation to the plaintiff as of that time.

As the affairs of the company worsened and the affection between Jones and Blayton cooled, Jones apparently decided to ignore the corporation and started doing an independent business "out of his pocket" as an individual proprietorship. It is not altogether clear whether in this endeavor he was using company equipment but it does appear that in this capacity he hauled only exempt commodities requiring no certificate. In other words there is no evidence that he preempted company business. It is also undisputed that none of the indebtedness owed plaintiff is attributable to this individual operation.

On September 16, 1968, the account owed plaintiff still being in arrears, it filed suit in this court against the corporation (Joe Jones Trucking Company, Inc.), Joe Jones individually (Joe Jones d/b/a Joe Jones Trucking Company) and Jesse B. Blayton.

The corporation made no defense to this action and makes none now. Of the other two defendants, only Blayton answered. With respect to Jones it appears that upon the complaint being served on him he delivered it to his then attorney who simply failed to file an answer or defense. When later called upon to explain this failure the attorney says that he filed no defense because Jones failed to furnish him with documents supporting his defense. It does appear, however, that Jones told him that he (Jones) did not owe the account, and since possession of the documents (if they existed) was not necessary as a prerequisite to the filing of a defense, the court can only conclude that the attorney was guilty of gross and inexcusable neglect.

On October 24, 1968 plaintiff took a default judgment against the corporation and Jones individually for the full amount sued for, plus interest.

Thereafter it appears that in an effort to rejuvenate the sinking firm Jones sought financing from another source and that in connection therewith was also seeking to transfer the ICC certificates to another corporate entity, they being, apparently, the only asset left in the corporation. Upon being apprised of this development, plaintiff filed a petition seeking the appointment of a receiver against Jones and the corporation and an injunction against any transfer of assets.

Up to this point none of this state of affairs had come to the actual attention of the court. A hearing on the receivership was held, however, and a temporary injunction was granted and a receivership denied. At this hearing the entire background began to unfold.

Following this hearing Jones began, understandably, to have difficulties with his attorney. In fact at this point the attorney disappeared from the Atlanta scene and Jones undertook to represent himself. In doing so, without any understanding of legal matters, and without having, in any way, challenged the default judgment entered months before,

he sought to simply ignore the judgment and defeat the injunction by showing that he did not owe the debt. The court will not prolong this opinion by reciting the endless confusion and explanations which this brought about. Suffice it to say the court found Jones' representation of himself to be wholly unsatisfactory. Moreover, he was financially unable to employ new counsel, and in order to try to follow and reestablish some semblance of orderly procedure, the court on November 12, 1969, obtained for him a legal aid attorney who agreed to serve without compensation. This attorney, in due course and on December 17, 1969, filed a motion to vacate the default judgment against Jones. A hearing was held on this motion and after considering it under advisement the court, with the consent of all counsel, agreed to set the entire case down for trial before the court without a jury. This trial was held on July 29, 1970, and from the evidence adduced at such hearing the court finds the foregoing statement of facts to be true. After this hearing counsel asked for extensions of time to obtain copies of the voluminous transcript and submit briefs. This has now been done and the case is ripe for decision.

The controversy, like Caesar's Gaul, can be divided into three parts:

(1) The continuance of the injunction previously entered;

(2) The setting aside of the default judgment against Jones; and

(3) The liability of Defendant Blayton.

The court now will consider these in reverse order.

## THE LIABILITY OF BLAYTON

By order dated October 21, 1969, the court had previously denied Defendant Blayton's motion for summary judgment, holding that:

" * * * [B]oth the guaranty agreement and the promissory note contain ambiguities which will need to be explained by evidence. Parol evidence is clearly admissible for such purposes."

■ The court heard this evidence at the trial on July 29 and, with respect to the nature of Blayton's undertaking, reached the findings of fact already recited. Under this evidence the court concludes that by the letter of May 9, 1967, Blayton undertook to guarantee and did guarantee the account owed by the corporation to the plaintiff, not the account of Jones individually, and that Blayton and the corporation are jointly liable therefor. *See* Blayton v. General Tire & Rubber Co., 119 Ga.App. 212, 166 S.E.2d 648 (1969).

## THE MOTION TO SET ASIDE THE DEFAULT JUDGMENT AGAINST JONES

■ From what has already been said it is clear that the motion to set aside this default was not filed within the one-year time limit provided by Rule 60(b) of the Federal Rules of Civil Procedure. It appears, however, that the reason an answer was not filed in the first place and the reason the motion was not filed in the second was not the neglect of Jones but the gross and inexcusable neglect of his counsel. At least one other court has held that dismissal resulting from counsel's *inexcusable* neglect does not amount to a dismissal for plaintiff's *excusable* neglect and thus is not within the one-year limit of Rule 60(b). *See, e. g.,* L. P. Steuart, Inc. v. Matthews, 117 U.S.App.D.C. 279, 329 F.2d 234 (1964), and McKinney v. Boyle, 404 F.2d 632 (9th Cir. 1968). Furthermore, at the trial on July 29 all parties agreed that the debt was in fact the debt of the corporation rather than of Joe Jones individually and that the only basis for any recovery against Jones is the default judgment. The Supreme Court has said that, except for those grounds which must be asserted within one year of entry of judgment, Rule 60 (b) "vests power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice." Klapprott v. United

States, 335 U.S. 601, 69 S.Ct. 384, 93 L.Ed. 266. Here the defendant was an uneducated layman. He does not read well and even after patient explanation has difficulty comprehending the involutions of a legal proceeding. It also appears from the evidence that during the period in question he also suffered from extreme anxiety about his business and spent several successive periods in a veterans hospital while he was being treated for hypertension. Certainly justice requires that in the circumstances of this case this default judgment be set aside. It will be so ordered.

### THE TEMPORARY INJUNCTION PREVIOUSLY ENTERED

The record discloses that the ICC certificates, although originally issued to Joe Jones individually, have since been transferred to the corporation. Plaintiff therefore no longer stands in danger of a fraudulent transfer of these certificates by Jones, particularly since the judgment against him has been set aside. The corporation, however, was and is liable to plaintiff and the certificates, so far as appears, are its only assets. The injunction against the transfer of these certificates is therefore continued against the corporation in order that they may be kept available until the plaintiff has at least had an opportunity to seek necessary orders from the Interstate Commerce Commission allowing it to levy upon or have the certificates transferred toward or subjected to the satisfaction of its judgment. The petition for a receiver is now moot, and case No. 12590 seeking such relief is therefore dismissed.

### DAMAGES

At the trial no party disputed plaintiff's evidence that the judgment against the corporation in the amount of $14,-638.47 was correct. If the amount is correct against the corporation it is also correct against Blayton.

It is therefore considered, ordered and adjudged that the plaintiff have judgment against the defendant Jesse B. Blayton in the amount of $14,638.47 plus interest at the rate of 7% per annum from October 24, 1968.

It is so ordered.